# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 3609 | **DATE** | 8/23/2001 |
| **CASE TITLE** | Keven York vs. Massanari | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for summary judgment is granted and Defendant's motion for summary judgment [19-1] is denied, and the case is reversed and remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. Section 405(g) for further proceedings consistent with this opinion. The Court urges the Commissioner to proceed promptly to rehear this matter.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | AUG 2 4 2001 | |
| | Notified counsel by telephone. | | | date docketed | 30 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | | FD-7 FILED FOR DOCKETING | 8/22/2001 | |
| | Copy to judge/magistrate judge. | | 01 AUG 23 PM 4: 27 | date mailed notice | |
| DK | courtroom deputy's initials | | | DK6 | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN YORK, | ) | |
| | ) | |
| Plaintiff, | ) | No. 99 C 3609 |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY G. MASSANARI, | ) | Magistrate Judge Morton Denlow |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court for a review of the final decision of Defendant, the
Commissioner of Social Security ("Commissioner"), denying Plaintiff, Kevin York
("Claimant" or "York"), disability insurance benefits ("DIB") under the Social Security Act
("SSA"). 42 U.S.C. § 416(i), 423(d). York claims he has been disabled since July 11, 1991,
after he injured his right knee at work carrying a 70 lb. motor down a flight of stairs.

York seeks judicial review of the Commissioner's final decision finding that he was
not disabled as of December 23, 1993. The matter comes before this Court on cross-motions
for summary judgment. The issue to be decided is whether substantial evidence in the record
supports the finding of the Administrative Law Judge ("ALJ") that York was not disabled
under the SSA as of December 23, 1993. For the reasons set forth below, the Court reverses
the ALJ's decision and remands the case to the Commissioner for further proceedings

consistent with this opinion.

## I. PROCEDURAL BACKGROUND

York filed his application for Title II DIB on March 10, 1994 alleging disability as of July 11, 1991 due to an injury to his right knee. (R. 66-67, 87). York's DIB application was denied on June 16, 1994 as the SSA determined that his condition did not keep him from working. (R. 72-76). On August 11, 1994, York filed a timely request for reconsideration which was subsequently denied on October 4, 1994. (R. 77-78, 80-82). Thereafter, York filed a request for a hearing. (R. 83-84). A hearing was held on September 12, 1995 before ALJ Maren Dougherty. (R. 27-65). The ALJ found York disabled from July 11, 1991 through December 23, 1993, but not thereafter. (R. 13-22).

York filed a timely request for review of the ALJ's finding that he was not disabled after December 23, 1993 with SSA's Appeals Council. (R. 12). On March 26, 1999, the Appeals Council denied York's request making ALJ Dougherty's decision the final determination of the Commissioner. (R. 5-6). On May 28, 1999, York filed this action requesting judicial review of the ALJ's decision.

## II. STANDARD OF REVIEW

Judicial review of a Commissioner's final decision is governed by 42 U.S.C. § 405(g) which provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ..." An ALJ's decision becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). Under such circumstances, the decision reviewed

2

by the district court is the decision of the ALJ. *Eads v. Secretary of the Dept. Of Health & Human Serv.*, 983 F.2d 815, 816 (7th Cir. 1993). A reviewing court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching its decision and whether there is substantial evidence in the record to support his findings. *Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may reverse the Commissioner's decision only if the evidence "compels" reversal, not merely because the evidence supports a contrary decision. *INS v. Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 815 n.1 (1992). The SSA gives a court the power to enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

### III. THE DECISION OF THE ALJ

The ALJ found York was disabled from his date of onset, July 11, 1991, through December 23, 1993. (R. 13-22). She found York's impairment was severe precluding him from returning to past work and preventing him from working in the national economy in any capacity during that time period. (R. 19).

The ALJ determined the Claimant had a severe impairment, but that his impairment

did not satisfy a listed impairment. (R. 18). Therefore, the ALJ was required to determine whether York could return to past work and if not, whether there was work for him in the national economy. (Id). The ALJ found the evidence was clear that from July 11, 1991 to December 23, 1993 the Claimant could not walk, or stand for two hours out of an eight hour day and he needed the assistance of crutches to walk. (Id). She found he was precluded from doing even sedentary work during that period. (Id). She concluded he could not perform his past work as a maintenance mechanic, and moreover could not perform any other work existing in the national economy because his limitations made even a sedentary job hard to find. (Id).

However, the ALJ found that as of December 23, 1993, the Claimant was experiencing medical improvement related to his ability to work because there was healing of his osteochondritis dissecans defect. (Id). She found he was "fully able to stand or walk two hours and sit for six hours out of an eight hour day as well as lift up to 10 pounds occasionally." (Id). Thus, as of that date, the ALJ concluded the Claimant could perform a full range of sedentary work and was not disabled. (Id).

The ALJ's first basis for finding York was not disabled as of December 23, 1993 is her reliance on the residual functional capacity ("RFC") assessments completed by State doctors. (R. 19). She says those opinions conflict with her RFC finding for the period from onset through December 23, 1993, but not for the period thereafter. (Id). Her rationale for concluding those opinions were not reliable during the period she found the Claimant disabled is that they were not supported by the medical evidence as a whole and they

4

conflicted with the opinions of the treating physicians regarding the nature and severity of York's condition. (Id). But, she found the same treating physicians' opinions were no longer reliable after December 23, 1993 because they were based on York's "ongoing complaints of pain which were belied by his actual activities." (Id). Therefore, as of December 23, 1993, she found the Claimant could perform sedentary work because it was consistent with objective evidence of healing. (Id). The ALJ found York's complaints of pain and claims of inability to put weight on his leg, as well as his alleged limited ability to perform daily activities were contradicted by objective evidence of healing derived from the doctors' reports and surveillance conducted in July and August 1994, by insurance investigators hired by the worker's compensation carrier. (Id).

Second, the ALJ relied on the non- State doctors' reports in the record to support her finding of no disability as of December 23, 1993. Specifically, she remarked that "office notes from Dr. Sweeney show that by March 1993 the osteotomy had healed and the claimant's pain was diminishing even though he was still not weight bearing." (R. 18). The ALJ also considered Dr. Steven Stern's evaluation from November 1993, one month before the ALJ determined York was no longer disabled. She commented that in Dr. Stern's evaluation he wrote the Claimant reported pain on weight bearing and continued use of crutches. But, the ALJ also noted his report indicated x-rays showed clear preservation of the articular cartilage joint space that was not consistent with an end stage knee arthritis. (Id).

One month later, on December 23, 1993, Dr. James Hill examined the Claimant. The ALJ also relied on his report in making her findings. In her decision, the ALJ notes Dr. Hill

found York had no effusion but marked crepitation of the right knee and that x-rays showed some medial joint space narrowing but a healed osteochondritis dissecans defect. (Id).

Dr. Goldstein examined Claimant in May 1994. He did so at the request of the worker's compensation insurance carrier. The ALJ commented the doctor noted that while the Claimant used crutches, he was placing weight on his knee. (R. 19-20). She also noted that his examination revealed some tenderness and soft tissue crepitance medially. (R. 20). Additionally, the ALJ commented Dr. Goldstein believed the x-rays showed a healed osteochondritis dissecans fragment that was in a satisfactory position and he thought there was some arthritic change on the medial compartment. (Id). However, she added that Dr. Goldstein did not recommend knee replacement surgery because of the Claimant's age. (Id). The ALJ addressed Dr. Sweeney's assessment from April of 1994, writing, "Claimant's doctor, Dr. Sweeney recommended a total knee replacement due to his ongoing complaints of pain and inability to ambulate." (R. 19). She did not however, explain why she did not find that report to be important.

The ALJ also gave great weight to the surveillance conducted in June and August 1994 by the insurance company defending the worker's compensation claim. She says the surveillance indicates, as Dr. Levin noted, the Claimant was seen in a parking lot behind his apartment popping the hood of one his cars and then taking a car to the gas station, filling the car with gas and checking the tire pressure. (R. 20). The ALJ contends he was seen during those times walking without crutches with a normal gait, and was able to climb a short flight of stairs easily. (Id). The ALJ found this "objective" evidence contradicted the

Claimant's testimony and the treating physicians' reports regarding his pain, swelling, and limited ability to perform daily activities. (R. 19-20).

The ALJ found the Claimant had a sedentary work limitation as of December 23, 1993, and could not perform his past work. (R. 20). However, she found the Commissioner had met its burden of proving that there were other jobs in existence which he could perform. (Id). She reached this conclusion by applying the grid in rule 201.28 of the Medical-Vocational Guidelines, Appendix 2, SubpartP, Social Security Regulations No. 4. (Id). This was based on the Claimant being 35 years old, completing two years of college and performing skilled work in the past. The ALJ did not base her decision upon the testimony of a vocational expert.

## IV. ESTABLISHING A DISABILITY

In order to be entitled to DIB under Title II of the SSA, the claimant must establish a "disability" under the SSA. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). To establish a "disability" the claimant must show he is suffering from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last" for at least 12 months. 42 U.S.C. §423(d)(1)(A).

The Social Security Regulations provide a five-step process to determine whether the claimant has established a "disability." 20 C.F.R. §404.1520(a). The process is sequential; if the ALJ finds the claimant is disabled or is not disabled at any step in the process, the analysis ends. *Id.* In the first step, the ALJ considers whether the claimant is working and whether such work is "substantial gainful activity." *Id.* at §404.1520(b). If the claimant is

working, the ALJ will find he is not disabled irrespective of medical condition, age, education, and work experience. *Id.*

If the claimant is not working, the ALJ will address step two: whether the claimant has an impairment or combination of impairments that is "severe." *Id.* at §1420(c). A "severe" impairment is one which "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* Basic work activities include sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, carrying out, and remembering simple work instructions, and using judgment. *Id.* at §404.1521(b). The ALJ is to consider the combined effect of multiple impairments "without regard to whether any [single] impairment, if considered separately, would be of sufficient severity." *Id.* at §404.1523; 42 U.S.C. §423(d)(2)(B). If the ALJ finds the claimant does not have a severe impairment, the claimant is found not to be disabled and the sequential analysis ends. 20 C.F.R. at §404.1520(b).

If the ALJ finds the claimant's impairment is severe, the ALJ considers step three: whether the severe impairment meets any of the impairments listed in Appendix 1 of Subpart P of Regulations No. 4. *Id.* at §1420(c). If the claimant's impairment meets or equals any impairment listed in the regulations, the ALJ will find the claimant disabled.

If the impairment does not meet any listed impairment, the ALJ moves to step four. *Id.* at §1420(e). Step four involves a consideration of the claimant's "residual functional capacity" and the "physical and mental demands" of the past relevant work experience. *Id.* A claimant's RFC is what that person is able to do, despite his or her limitations. *Id.* at

§404.1545. If the claimant is still able to perform work that he had performed in the past, the ALJ will find that the claimant is not disabled. *Id.* at §1420(e).

If the claimant's impairment is so severe that he is unable to perform past relevant work, the burden shifts to the Commissioner to show that the claimant, considering his age, education, past work experience, and RFC, is capable of performing other work which exists in the national economy. 42 U.S.C. §423(d)(2)(A); *Brewer*, 103 F.3d at 1390.

## V. THE ALJ'S DECISION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

The ALJ concluded York was disabled from his date of onset through December 23, 1993 and was capable of performing the full range of sedentary work as of that date. The evidence does not support this conclusion. The record does not support the date the ALJ chose to end York's disability status.

## A. The ALJ Erred in Ignoring Medical Evidence of York's Pain and Swelling

The ALJ is required to take into consideration all of the evidence in the record and discuss significant evidence contrary to her ruling. *Godbey v. Apfel*, 238 F.3d 803, 808-809 (7th Cir. 2000). The ALJ's finding that medical improvement related to the Claimant's ability to work occurred as of December 23, 1993, is not supported by substantial evidence. In the ALJ's decision, she found as of December 23, 1993, the treating physicians' opinions were no longer reliable as they were clouded by the Claimant's continuous complaints of pain which were belied by his actual activities. In reaching this conclusion, the ALJ ignored evidence in the record.

York's actual activities the ALJ made reference to included; taking care of his daughter, walking 20 ft. from his apartment to his car which only includes one step (not a flight of stairs as mischaracterized by the ALJ), putting gas into his car, and going to doctors' appointments. (R. 48-49, 58-61). The ALJ states:

> The claimant asserts that he has never been able to tolerate any weight bearing for any length of time, that he must elevate his leg regularly, and that his pain affects his concentration. However, that assertion was belied by objective evidence of healing as well as by surveillance conducted in July and August 1994 by investigators hired by the workers compensation carrier. (R. 19).

Even if, as the ALJ states, the evidence from 1994 shows improvement, she has not shown her finding of not disabled as of the specific date of December 23, 1993 to be supported by substantial evidence. The only evidence to support her finding as of that date is Dr. Hill's report that was dated December 23, 1993 from his examination the day before. (R. 140). However, the Court is left only to guess this is the evidence she was relying upon because she did not state specifically what caused her to set December 23, 1993 as the date on which York was no longer disabled. The ALJ refers to Dr. Hill's report briefly as follows:

> On December 23, 1993, James Hill, M.D., who examined the claimant, reported no effusion but marked crepitation of the right knee. X-rays showed some medial joint space narrowing but a healed osteochrondritis dissecans defect. (R. 18)

The ALJ omitted the portion of Dr. Hill's report that states in addition to the marked crepitus, York reports severe pain on palpitation of the anterior medial joint line and the notation that York has a complex problem for which Dr. Hill recommended cartilage articular repair replacement surgery. (R. 140).

10

The ALJ also ignored other medical evidence in the record which substantiated the Claimant's testimony. For instance, Dr. Sweeney reported significant swelling in his records from July 1993. In March and May of 1995, Dr. Sweeney's records indicated significant swelling which required the doctor to aspirate fluid from the knee. (R. 384, 386). This evidence was objective evidence corroborating York's complaints of swelling, which the ALJ ignored.

Moreover, the ALJ relied heavily on the healing of the dissecans lesion as a basis for her determination that York was no longer disabled as of December 23, 1993. However, there was more to York's knee problem than the dissecans lesion and the ALJ failed to even discuss this. (R. 18, 19). First, York's hyaline and fibrocartilage was showing degenerative changes beginning in August 1992. (R. 159). Furthermore, in May 1994, Dr. Goldstein diagnosed osteoarthritis. (R. 199). Third, in August 1994, Dr. Levin noted atrophy four fingerbreadths superior to York's right patella, clicking with range of motion of the knee and an abnormal sensory examination with evidence of numbness over the lateral and anterior right knee. (R. 203). Not only did the ALJ fail to address these problems, two of the examining doctors noted problems with York's knee in 1994. The ALJ did not explain how she was able to dismiss those opinions when choosing to end the Claimant's disability status several months prior.

As discussed *supra*, the ALJ also found the surveillance conducted by the worker's compensation carrier's insurance company to be objective evidence of healing. Although the Court holds the ALJ's reliance on the surveillance reports was inappropriate, there was

11

evidence within the surveillance reports the ALJ ignored which substantiated Claimant's complaints of pain and swelling. For instance, the insurance company records show that as of April 12, 1994, the Claimant was walking on crutches all the time and they had not "caught him doing anything." (R. 261). Furthermore, there is a suggestion in the insurance company records that they believed York was severely disabled. (Id). The ALJ only focused her finding on the portion of the report where it alleges the Claimant was walking without crutches, however, she failed to address how this evidence, discovered in 1994, was able to bolster her finding that York was no longer disabled as of December 23, 1993. Even if the Court found the surveillance data appropriate, which it does not, the ALJ still provides no explanation as to how the evidence in the reports is tied into the date she chose to end York's disability status.

Finally, this Court cannot uphold a decision by an ALJ if the reasons given by her do not build an accurate and logical bridge between the evidence and the result. *Green v. Shalala*, 51 F.3d 96, 100-01 (7th Cir. 1995). The ALJ did not build a bridge between the medical evidence of record and her finding that medical improvement occurred as of December 23, 1993. She does not explain why she chose that specific date and she does not link any evidence to that date. Thus, the ALJ erred in finding York disabled as of December 23, 1993.

## B. The ALJ Erred in Relying on Liberty Mutual's Surveillance

In making her findings, the ALJ also relied on surveillance conducted by the insurance company defending against York's worker's compensation case. The ALJ admitted

12

into the record the insurance company's records including the investigation reports.

In *Keller v. Sullivan*, 928 F.2d 227, 230 (7th Cir. 1991), the court held investigative reports that might otherwise be considered hearsay can be admissible in administrative proceedings as long as they are relevant and material, and if they have sufficient indicia of reliability. In *Keller*, the claimant was seeking DIB because he suffered from a right leg injury. *Keller*, 928 F.2d at 228. In the record before the ALJ in *Keller* there were notes from a treating physician in which he stated that investigative reports had been called to his attention which described the claimant working at his wife's tavern and showing no signs of a limp. *Id.* at 229. During his hearing, the ALJ asked Keller about his work at the tavern. *Id.* Keller answered that "although he spent up to eight hours a day at his wife's tavern, he worked only when his wife was not available and he did none of the bookkeeping, banking, or handling of the money." *Id.*

The ALJ did not find the claimant credible but found there was insufficient evidence to determine whether he was engaging in substantial gainful activity in his wife's tavern. *Id.* After the case was remanded to the ALJ, the ALJ subpoenaed the insurance company's investigative reports. *Id.* Those reports indicated Keller frequently worked at his wife's tavern. *Id.* Investigators watched Keller on two different occasions. The first period was from March 19 to April 1, 1985. *Id.* During that time, the investigator visited the tavern four times and saw Keller bartending each visit. *Id.* The second time period was from May 21 to June 7, 1985. *Id.* The investigator went to the tavern six times and Keller was bartending during five of those visits. *Id.* On one specific trip to the tavern, the investigator reported

13

observing Keller tending bar while his wife was sitting at the bar talking to a customer. *Id.* The entire time the investigator was in the bar, Keller tended bar, receiving no assistance from his wife. *Id.*

In *Keller*, the investigative reports were inconsistent with the claimants' testimony. Keller had testified that he worked only when his wife was not available. On almost every visit to the tavern, investigators saw Keller working behind the bar and on at least one visit saw his wife sitting there, obviously available. The ALJ found that the investigative reports were admissible and that they were substantial evidence that Keller had engaged in substantial gainful activity at the tavern. *Id.* at 230.

In *Keller*, the court used four factors to determine the investigative reports the ALJ based her findings on were sufficiently reliable. *Id.* First, the investigators were employed by Keller's former employer or worker's compensation carrier to make observations and report them responsibly. *Id.* The court reasoned that even if the employer was biased, it would want facts it could rely on and want the investigators to be able to testify. *Id.* Second, the observations were easy to make and did not require any technical expertise. *Id.* Third, there were two periods of observations covering reasonable amounts of time and a number of different occasions. Lastly, the reports appeared to be made by two different people and were consistent.

The case the Court faces now is quite different from that in *Keller*. In this case, the Claimant's testimony was consistent with the investigator's findings and the investigative reports do not contain the requisite indicia of reliability. York's testimony at the hearing was

14

consistent with the documentation in the investigative reports. At the hearing, York was asked how often he uses his crutches. (R. 42). He answered, " I'm still on and off of them occasionally." (Id). Specifically, he responded he used crutches three to five times a week. (R. 42-43). York was directly asked about an incident in which he was allegedly seen putting oil in his car and walking across a parking lot. (R. 48). He explained that while he was putting the oil in the car he was leaning on the car with his left leg. (R. 49). He also testified that he did walk across the parking lot without an aid, but that he was in and out of therapy and was trying to help himself. (Id). York never testified that he used his crutches seven days a week. The fact that the surveillance reports indicate he walked without crutches on any given day is not contradictory to the testimony York gave it his hearing.

Regardless of whether the Claimant's testimony was consistent with the investigative reports, the investigative reports were not reliable. First, the reports were incomplete because large portions of the report which are blackened out. This certainly creates suspicion and refutes the indicia of reliability absent an explanation. Second, the observations of York were not difficult to make. It is clear however, that investigators were only conducting surveillance outside the Claimant's home and therefore were not able to determine what he was doing inside his home. Furthermore, the investigators only viewed the Claimant for short periods of time. Lastly, the sections of the investigative report are not consistent with each other. One portion of the report indicates the Claimant was walking without crutches, while another says the investigators saw him using crutches at all times and could not catch him at anything. (R. 266, 261). Finally, the reports do not relate to December 23, 1993. In fact,

15

the ALJ refers only to the July and August 1994 observations to support her conclusions.

The ALJ's finding that the Claimant was no longer disabled as of December 23, 1993 was largely based on unreliable information and thus there was no substantial evidence for such a finding. The surveillance material in this case did not have sufficient indicia of reliability. [1]

## C. The ALJ Erred By Not Calling A Vocational Expert To Testify

York's exertional and non-exertional limitations may have significantly impacted his ability to perform a job in the sedentary occupational base. For this reason, the ALJ erred in not calling a vocational expert ("VE") to testify as to the jobs York is capable of performing despite his limitations.

The Commissioner bears the burden at step five of the sequential analysis to produce evidence of a significant number of jobs accommodating the claimant's RFC and vocational characteristics. *Knight*, 55 F.3d at 313. The ALJ may establish this evidence by applying the Medical- Vocational grid rules or by consulting a vocational resource. SSR 96-9p. The use of the grid rules in determining whether a claimant can perform sedentary work is inappropriate where the claimant's nonexertional impairments are so severe as to limit the

---

[1] In her decision, the ALJ also appears to have given some weight to the surveillance video discussed in the insurance company's investigative reports. She found the Claimant's testimony was contradicted by "surveillance conducted in July and August 1994 by investigator's hired by the worker's compensation carrier." (R. 19). Additionally, she noted in her findings, " a surveillance videotape showed that the [C]laimant walked freely without crutches." (R. 20). It is unclear whether the ALJ was basing her opinion on the actual video or the surveillance reports regarding what was recorded on the video. Although the ALJ did view the video it was not made a part of the record before the ALJ and is not a part of the record before this Court.

range of work he can perform. *Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994). If that is the case, the ALJ's disability determination is made through the "testimony of vocational experts who can indicate what work, if any, the claimant is capable of performing." *Herron*, 19 F.3d at 336-337, *quoting Nelson v. Secretary of Health and Human Services*, 770 F.2d 682, 684( 7th Cir. 1985); *See also, May v. Apfel*, 1999 WL 1011927 * 10 (N.D. Ill. 1999)(When a claimant suffers from both exertional and nonexertional impairments the ALJ may not be able to rely solely on the grid rules and may use a vocational expert).

The grid rules in 20 C.F.R. Pt. 404, Subpt. P, App. 2, set forth rules that identify whether jobs requiring specific combinations of physical ability, age, education, and work experience exist in significant numbers in the national economy. *Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983); 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b). When a claimant's RFC and vocational factors coincide with all the criteria of a particular grid rule, the rule directs a conclusion of disabled or not disabled. 20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b).

In this case, for York to coincide with a particular grid rule, he "must be able to perform substantially all of the strength demands defining the sedentary level of exertion, as well as the physical and mental nonexertional demands that are also required for the performance of substantially all of the unskilled work considered at the sedentary level."[2]

---

[2]Exertional limitations affect the ability to meet the strength demands of jobs, such as sitting, standing, and walking. See 20 C.F.R. § 404.1569a(b). Nonexertional limitations relate to the ability to meet other demands of a job, including: postural limitations, limitations resulting from an inability to concentrate, and limitations from difficulty understanding or remembering. See 20 C.F.R. § 404.1569a(c)(1).

Social Security Ruling 96-9p, 61 Fed. Reg. 34478, 34480 (1996). The ALJ relied on the grid in Rule 201.28 of the Medical- Vocational Guidelines, Appendix 2, Subpart P, Social Security Ruling No. 4 in determining the Commissioner had met its burden. The ALJ found York could perform the full range of sedentary work as of December 23, 1993 and therefore applied grid rule 201.28 to conclude York was not disabled. However, the ALJ should have called a VE to provide which jobs would be available to someone like York who may be capable of performing sedentary work but is severely limited by pain and other exertional and non-exertional limitations. *Herron*, 19 F.3d at 336-337; SSR-96-9p.

For example, the Claimant must elevate his knee when it is swollen. (R. 40, 51). Having to elevate one's knee in the workplace may have vocational significance because the resulting posture may not allow the individual to maintain competitive pace and rate at his work station.[3] Furthermore, as of July 1995, Dr. Sweeney released York to work, but restricted him to sitting only. (R. 382). Sedentary work requires that an individual be able to walk for up to 2 hours of the workday. 20 C.F.R. § 404.1545(a). Certainly the ALJ should have called a VE to help determine if there were jobs available that would allow the Claimant to sit for the entire work day. Throughout the Claimant's testimony and the objective medical evidence there are claims that York's knee problems are causing him significant pain. Pain may also interfere with an individual's ability to maintain attention and

---

[3] The Claimant did try to work but was unsuccessful because his knee became so swollen that it needed to be drained by Dr. Sweeney. (R. 47). York testified he had to stop working because he couldn't walk around or carry the tools and do his job. (Id). The ALJ should have called a VE to address York's claims of swelling and the impact it has on his ability to perform a sedentary job.

concentration; sustain a competitive pace or rate; or even complete a normal work-day or work-week. The ALJ should have called a VE to testify as to how the Claimant's pain interferes with his ability to work. Because there was no VE testimony upon which the ALJ could rely, the ALJ's decision was not supported by substantial evidence.

## V. CONCLUSION

For the foregoing reasons, **Plaintiff's motion for summary judgment is granted and Defendant's motion for summary judgment is denied, and the case is reversed and remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405 (g) for further proceedings consistent with this opinion. The Court urges the Commissioner to proceed promptly to rehear this matter.**

**SO ORDERED THIS 23rd DAY OF AUGUST, 2001.**

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies delivered in open court or mailed to:**

Marcie E. Goldbloom
Frederick J. Daley, Ltd.
727 South Dearborn, Suite 613
Chicago, Illinois 60605

Attorney for Plaintiff

Kathryn A. Kelly
Assistant United States Attorney
219 South Dearborn, 5th Floor
Chicago, Illinois 60604

Todd A. Duclos
Assistant Regional Counsel
Social Security Administration
200 West Adams Street, 30th Floor
Chicago, Illinois 60606

Attorneys for Defendant